Clarence JACKSON, Appellant,

v.

STATE of Missouri, Respondent.

No. 55590.

Supreme Court of Missouri, Division No. 1.

Jan. 11, 1971.

---

**700**

Louis A. Robertson, St. Louis, for appellant.

John C. Danforth, Atty. Gen., J. Michael Jarrard, Asst. Atty. Gen., Jefferson City, for respondent.

HOUSER, Commissioner.

Clarence Jackson has appealed from an order denying relief under Criminal Rule 27.26, V.A.M.R., following an evidentiary hearing.

On July 6, 1965 Jackson pleaded guilty to murder in the second degree and was sentenced to 12 years' imprisonment. While serving his sentence and on May 20, 1969 Jackson filed an amended motion to set aside the judgment and sentence. He appeared personally and by a court-appointed attorney at the hearing of the motion and testified at length in his own behalf. Jackson's lawyers testified for the State. The court made findings adverse to Jackson's claims, filed a written memorandum and denied the motion. His court-appointed counsel perfected this appeal.

Appellant's sole point is that he did not have the knowledge and understanding essential to enter a valid plea, did not in fact understand the nature of the charge, and that his plea of guilty was not voluntarily made.

Jackson was originally indicted for first degree murder. While in jail awaiting trial he was visited by and consulted with his father and his mother and a Catholic priest who was also a lawyer. He was also interviewed by Mr. Chancellor, a lawyer on the staff of the Public Defender's Bureau, who testified at the 27.26 hearing that he interviewed Jackson 5 or 6 times; that the taking of the original statement took about an hour; that several times he and Jackson discussed his defense of accident, which was that Jackson had fired two shots in the general direction of a group in which Foster, the victim, was present and that it was by coincidence that Foster was the one who was struck. Mr. Chancellor discussed the case with the Circuit Attorney's office, from which he learned that the state was prepared to show that Jackson and one Cheatham had had a recent confrontation with Foster and that they were aggravated with Foster; that on the night in question they went by Cheatham's home, procured a pistol, walked in the direction of the house where Foster was, and that Jackson fired two shots in the general direction of Foster, who was hit. Mr. Chancellor told Jackson that under these circumstances the defense of accident was going to be "a major obstacle for a jury." A file setting forth the facts and circumstances of the case was presented to Mr. Noskay, Chief Counsel of the Public Defender's Bureau, who testified that he talked with Jackson, explained the range of punishment (the maximum and minimum) for both first and second degree murder and manslaughter; advised him that there was a possibility of a con-

viction of manslaughter but that he thought the jury would find him guilty of first degree murder and assess life imprisonment or the death penalty. In the meantime the Circuit Attorney's office, which had first offered to recommend 20 years' imprisonment on a plea of second degree murder, on further discussion with the Public Defender people, agreed to recommend 12 years on second degree murder. Mr. Noskay told Jackson that the state was prepared to recommend 12 years and advised him to take this offer and plead guilty. Mr. Noskay testified that Jackson did not indicate any reluctance to accept his advice, did not ask for a period of consultation with members of his family or any other lawyer, and that when the State reduced the charge from first to second degree murder and made the recommendation of 12 years, with Mr. Noskay standing at his side in the courtroom, Jackson entered his plea voluntarily and knowingly; that considering his mental attitude and demeanor, Jackson was cognizant of the consequences of his plea.

Mr. Chancellor testified that the records of the Public Defender Bureau showed in Mr. Noskay's handwriting that the latter appeared with Jackson at his arraignment; that Chancellor not only talked with Jackson 5 or 6 times but also talked with Jackson's mother, Cheatham's mother and two young persons who were witnesses for the State; that when the State made the 12-year offer Mr. Chancellor discussed the offer with Jackson. There was "a good deal of discussion" about his right to a trial by jury. Mr. Chancellor explained to him the hazards of going to trial before a jury and that the defense of accident would be a major obstacle for a jury under the facts the State was able to show. The plea was entered in May, 1965 but the passing of sentence was postponed to July 6, 1965 for a parole investigation. Mr. Chancellor did some work looking toward probation but was doubtful about the prospect of probation. Prior to imposition of sentence Jackson was "apprehensive" but according to

Mr. Chancellor, Jackson was prepared to face the sentence of the court and did not claim that he was other than guilty as charged, or that he was being imposed upon or that his rights were being denied. The court session at which sentence was passed was an unusually long proceeding, with "quite a bit of speaking," participation by the court, by Mr. Chancellor, by Mr. Mann from the parole office, and by the defendant Jackson at great length.

In support of his motion to set aside the judgment and sentence Jackson testified that he talked to one of his attorneys twice and to his other attorney but once prior to his plea of guilty; that he was advised by his attorneys that he was charged with first degree murder and that he could receive a life sentence or the gas chamber upon conviction of murder in the first degree (with which he was originally charged); that he was 18 years of age at the time and "don't think this did not frighten me, it did"; that he had "heard different stories about the gas chamber, and death, and [being?] sentenced to death." He conceded that his two lawyers informed him that the penalty for first degree murder was death or life imprisonment and that the maximum penalty for second degree murder was life imprisonment, but he testified that he was not advised as to the minimum penalty for second degree murder. In a previous statement Jackson recited how Mr. Noskay had told him that if he took a jury trial he would get a life sentence or the gas chamber; that he could plead guilty and get 12 years, and that he advised him to take it; that Jackson told Mr. Noskay that he wanted to call his father and "see what he was going to do about a lawyer." Later Jackson talked with his father but no arrangements were made for any other lawyer than Mr. Noskay and Mr. Chancellor. Jackson testified that one of his attorneys told him that he would try to get a parole for him; that if he took the 12-year term he would be out of the penitentiary by the time he was 21 years old; that his counsel

Mr. Noskay made no positive statement about getting a parole and did not assure him that he would be paroled, but merely stated that he would try to get a parole for him; that his attorney Mr. Chancellor did not make any promises to him "about anything"; and that at the time of allocution Jackson had "no reason at all" to tell the court why he should not be sentenced.

According to his lawyers no promises of parole or probation were made to Jackson; there was no promise of release from the penitentiary by a certain date or that counsel could be influential with the sentencing court or the probation and parole office. Jackson conceded that he had an opportunity to talk with his father and to a priest who was a lawyer; that he understood from talking to his lawyers that he had a right to a jury trial. He claimed, however, that he was confused at the time of the plea and "didn't know anything about the law." In one breath he said that it was not explained to him by Mr. Chancellor before he pleaded guilty. In the next breath he admitted that Mr. Noskay told him about it. Near the end of his direct examination this occurred: "Now, have you told the Court everything with reference to what you want, what you have stated with reference to your constitutional rights being violated? A. Yes. Q. Sir? A. Yes, I have. Q. Is there anything that you want to add other than what I have asked you about with reference to the violation of any of your rights as you alleged in your first motion? A. No." Near the end of the cross-examination he was asked whether he did in fact shoot the victim, and he answered "That's correct." He was then asked, "So we're not arguing about whether or not you committed the crime; we're arguing about whether or not your plea of guilty was entered in compliance with the Constitution of the United States, is that right?" His answer: "That's right."

The trial court found that Jackson admitted that he was aware that he might not receive a parole; that Jackson acknowledged that he was guilty of murder in the second degree and minutely described his actual shooting of the victim; that Messrs. Noskay and Chancellor were well known, capable, conscientious members of the Public Defender's office, well qualified by experience in criminal cases, and that their testimony belied the statements of Jackson; that Jackson's own testimony indicated that he was duly advised of the consequences of a plea; that Jackson's constitutional rights were in no way violated and that his contentions about having been promised a parole in return for a plea of guilty were "clearly inconsistent with the facts substantiated and based upon the transcript of the record."

■ Whether this record will stand the test of a postconviction challenge under Criminal Rule 27.26 depends upon whether the findings, conclusions and judgment of the trial court are clearly erroneous. On the question of parole Jackson admitted that no assurances or promises were made. With respect to Jackson's suggestion that he was promised release by the time he reached age 21; his complaint that he talked to his attorneys on only three occasions, and his contention that he was not advised as to the minimum penalty for murder in the second degree, there was direct evidence to the contrary. Obviously the trial judge believed the witnesses who testified to the contrary and disbelieved appellant. We defer to the finding of the trial court in such case. Walster v. State, Mo., 438 S.W.2d 1, 2[1].

On the general issue of voluntariness it is impossible to read this record objectively and come to any conclusion other than that Clarence Jackson, who had a tenth grade education, whose answers to questions were responsive and whose testimony was intelligent, was fully and completely informed as to the nature of the charge against him and the range of punishment for both first and second degree murder; that his case was thoroughly investigated; that his own admissions showed that he was guilty of

murder; that there was no substance to the defense of accident; that he was advised and understood that he had the right to a trial before a jury but that in the judgment of experienced counsel he would be found guilty of first degree murder and sentenced either to life imprisonment or given the death penalty; that his counsel negotiated with the Circuit Attorney's office and secured their recommendation of a reduction of the charge from first to second degree murder and a sentence of 12 years (only 2 years in excess of the minimum); that Jackson was advised that it was to his best interest to accept this offer; that he had the benefit not only of the advice of his two court-appointed lawyers but also of his parents and priest; that he was frightened by the prospect of death in the gas chamber; that he made a voluntary and intelligent choice between alternative courses of action open to him in entering a plea of guilty to a reduced charge of second degree murder; that he had nearly two months between the time he pleaded guilty and the time he was sentenced to further reflect on his choice, and that when he was finally brought before the court for sentence (again with counsel present) he had no reason to offer why he should not be sentenced.

Although Jackson has not contended that his plea of guilty was engendered by fear of the death penalty, we will examine that question in view of his testimony that death was one of the prospective penalties if he went to trial before a jury and that he was frightened by the different stories he had heard about the gas chamber, and an undeveloped bit of testimony appearing in the transcript indicating that on one occasion Jackson called Mr. Chancellor over to the jail and told him that "what he had stated all this time was wrong, that he was not the one who fired the pistol, that it was, in fact, Marvin Cheatham who fired the pistol." Since this case was submitted, and on November 23, 1970, the Supreme Court of the United States decided North Carolina v. Alford, 400 U.S. 25, 91 S.Ct.

160, 27 L.Ed.2d 162, in which a conviction and sentence of 30 years' imprisonment on a plea of guilty to a charge of second degree murder, reduced from first degree murder, was upheld in the face of a claim that defendant's plea of guilty was invalid because it was the product of fear and coercion, and in spite of the fact that Alford at all times protested his innocence. The trial judge heard evidence indicating clearly that the State had a strong case of first degree murder against Alford. In the majority opinion Mr. Justice White observed that the standard is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to an accused; that the fact "[t]hat he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage" and that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." If a plea of guilty on a negotiated reduction of a first degree murder charge by an accused represented by counsel will be upheld as voluntary in spite of his steadfast protestation of innocence, by the greater reason the voluntariness of Jackson's choice of grim alternatives, *where he admits his guilt,* must be upheld and approved.

■ On this record the findings, conclusions and judgment of the trial court are not clearly erroneous. Instead, they are substantiated not only by the State's witnesses but also in large measure by the testimony of appellant himself. Accordingly, under the limited scope of review prescribed by Criminal Rule 27.26(j), V.A.M.R., the judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.